**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|        Plaintiff, | ) | |
| | ) | |
|     v. | ) | 12 C 969-1, 12 C 969-2 |
| | ) | |
| JOHNNY CHAPARRO and | ) | Judge John Z. Lee |
| JOHNNY MENDEZ, | ) | |
| | ) | |
|        Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Johnny Chaparro and his son, Johnny Mendez, are charged with conspiracy to possess with intent to distribute and conspiracy to distribute large quantities of cocaine and heroin. Mendez also is charged with a separate firearms offense. The indictment was a culmination of an extensive investigation by the Chicago Police Department ("CPD"), the Drug Enforcement Administration ("DEA"), and the U.S Attorney's Office that focused on members of the Spanish Cobra street gang. The investigation spanned several months and included numerous wire taps and near-constant surveillance.

On November 30, 2012, after a rather complicated sequence of events, law enforcement officers entered Mendez's residence without a warrant, secured the premises, arrested Mendez and Chaparro, and searched the house, whereupon they found nearly three kilograms of heroin, 60 grams of cocaine, more than $200,000.00 in cash, and a loaded firearm. Believing that these actions violated their constitutional rights, Chaparro and Mendez have filed motions to suppress the items discovered in Mendez's house, and Mendez separately seeks to suppress certain statements that he made to the officers at that time. After considering the parties' submissions

and the testimony provided during the two-day evidentiary hearing, the Court denies the motions to suppress [doc. nos. 164, 165, 166].

**Factual Background**

We begin with a review of the government's investigation into the activities of Chaparro and Mendez prior to the date of the events in question.

**1.      The Events of September 2 and 3, 2012**

On September 2 and 3, 2012, Chaparro had a number of telephone conversations with Jose Arguijo ("Arguijo"), during which Chaparro arranged to purchase ten kilograms of cocaine from Arguijo.   Compl. II, Lukens Aff. ("Compl. II") ¶¶ 19-23.[1]   These calls were intercepted by law enforcement officers.[2]   Law enforcement officers also intercepted phone calls between Chaparro and Paul Jenkins ("Jenkins"), one of Chaparro's customers, during which Jenkins agreed to purchase three kilograms of cocaine from Chaparro.  *Id.*

On September 3, 2012, surveillance officers observed Arguijo arrive at Chaparro's house, which is located at 3754 N. Oketo, Chicago, Illinois.  Arguijo was carrying a black suitcase, and he and Chaparro entered the residence.  *Id.* ¶¶ 33-49.  Officers also observed Jenkins and Lakisha White ("White") enter Chaparro's house.  Jenkins was carrying a brown paper bag thought to contain cash, and White was carrying a purse.  *Id.*  Jenkins and White left shortly thereafter without the brown paper bag.  *Id.*  Law enforcement officers later stopped Jenkins and White and seized three kilograms of cocaine from their vehicle.  *Id.* ¶¶ 50-52.

---

[1] As used herein, "Compl. I" refers to the criminal complaint filed in the instant case, 12CR969; "Compl. II" refers to the complaint filed in the related case, 13CR155.

[2] These phone calls, as well as the other phone calls recounted herein, were intercepted pursuant to Title III wiretap orders, the validity of which are not in question here.

Once Jenkins realized that the cocaine had been taken from his car, he called Chaparro to inform him that police officers had seized the cocaine. *Id.* ¶¶ 51-52. Officers then overheard a phone call between Chaparro and Mendez, during which Chaparro stated "I'm sweating here" and "[s]omething happened." *Id.* ¶ 53. Chaparro also asked Mendez for the alarm code to his house, which was located at 3717 N. Olcott Avenue, two blocks from Chaparro's house. Mendez complied. *Id.* ¶ 54. Surveillance officers next observed Chaparro leave his residence with a plastic shopping bag containing brick-shaped objects. He then proceeded to Mendez's residence and entered the house carrying the same bag. Chaparro then was observed leaving the Mendez house without the plastic shopping bag. *Id.* ¶ 55. Based on the foregoing facts, law enforcement officers believed that Chaparro had transported a significant quantity of cocaine from his house to Mendez's house, where it was stored.

### 2. The Events of September 19, 2012

On September 19, 2012, law enforcement officers intercepted phone conversations between Mendez and co-defendant Joel Melendez ("Melendez"). *Id.* ¶¶ 65-66, 68-70. During those conversations, Mendez arranged to sell 225 grams of heroin to Melendez. *Id.* Officers also intercepted phone conversations between Mendez and an unidentified woman, later identified as Jamie Rosado, who lived with Mendez at his house. *Id.* ¶ 67; TP5 #3393. At the time of the conversations, Rosado was at the Mendez residence, and Mendez asked her to weigh, package, and give the heroin to Melendez once he arrived at the house. *Id.* Shortly thereafter, surveillance officers saw Melendez enter the Mendez residence carrying a black backpack. He emerged four minutes later, then drove away. Compl. II ¶¶ 72, 74. Based on these facts, law enforcement officers believed that heroin was stored at Mendez's house.

### 3. The Events of November 9, 23, and 24, 2012

On November 9, 2012, law enforcement officers intercepted another call between Chaparro and Mendez. TP7 #4088. Chaparro asked Mendez to "open the back," which the officers understood as directing Mendez to open the door to the detached garage on his property so that a drug courier could deposit a shipment of drugs. *Id.* Shortly thereafter, surveillance officers observed Lucio Cuevas ("Cuevas"), a suspected drug courier for another one of Chaparro's cocaine suppliers, Antonio Valencia-Pantoja ("Valencia"), drive a green Hyundai with Chaparro as a passenger into Mendez's garage. Hr'g Tr. 56, 80, 92. The garage door closed, then reopened approximately fifteen minutes later, and Cuevas and Chaparro drove away together. *Id.* 57. Based on their observations of this pattern of conduct, the officers believed that a shipment of narcotics had been unloaded in Mendez's garage, which they believed would be brought into the Mendez residence for storage and safekeeping. *Id.*

Furthermore, at 5:22 p.m. on November 23, 2012, Chaparro had a telephone conversation with another one of his customers, Troy Wilson ("Wilson"). *Id.* 57-62. During the conversation, Wilson told Chaparro that "the guy is on his way." *Id.* 59. Minutes later, at 5:40 p.m., Chaparro called Mendez and asked Mendez to let him into Mendez's garage. TP12 #138. Officers observed Arguijo drive a black Acura with Chaparro as a passenger into Mendez's garage. Hr'g Tr. 16, 61. Arguijo and Chaparro exited the vehicle before the garage door closed. *Id.* Seven minutes later, the garage door opened, and Arguijo and Chaparro drove away. *Id.* Based upon their visual observations and the intercepted calls, officers believed that Arguijo had driven Chaparro to the Mendez house in order to deliver some narcotics and pick up some narcotics to bring back to Wilson. *Id.* 62. Later that day at 9:00 p.m., Wilson told Chaparro on the telephone

that "it's all cooked," which officers took to mean that Wilson had cooked up the cocaine into crack cocaine. TP12 #149; Hr'g Tr. 63.

The next day, November 24, 2012, at 2:10 p.m., Wilson told Chaparro that he wanted to buy more cocaine the "same way from yesterday." To the officers, this meant that Wilson wanted to purchase the same amount of cocaine from Chaparro that he had purchased the day before. TP12 #161; Hr'g Tr. 64. A minute later, Chaparro called Mendez to tell him that he was coming over to the house. The officers understood this to mean that Chaparro was going to pick up narcotics from the Mendez house for the impending transaction. TP12 #162; Hr'g Tr. 64-65.

### 4. The Events of November 26, 2012

On November 26, 2012 at 12:03 p.m., law enforcement officers intercepted yet another call between Chaparro and Mendez. TP7 #5500; Hr'g Tr. 67. Based upon the conversation between the two, the officers believed that Chaparro had an impending shipment of narcotics coming and needed to use Mendez's house to store the narcotics upon its arrival. *Id.* Less than ten minutes later, during another intercepted call, Arguijo told Chaparro that the shipment would be two kilos less than what Chaparro had anticipated. TP12 #0000; Hr'g Tr. 69. Two hours later, at 2:06 p.m., officers overheard Mendez asking Chaparro why the delivery to his house was delayed. TP 7 #5501; Hr'g Tr. 70.

At around the same time, officers who were conducting surveillance in the area around Chaparro's residence saw Arguijo driving around in the same Acura they had observed on September 2, 2012. Hr'g Tr. 72. Law enforcement officers approached Arguijo in an undercover vehicle with flashing lights and asked him to step out of the vehicle. *Id.* 73. After he complied, one officer jumped into Arguijo's vehicle and drove away, while the other officer

jumped back into the covert vehicle and left the area. *Id.* The officers discovered several kilograms of cocaine in the Acura, and Arguijo subsequently was arrested. *Id.*

### 5. The Events of November 29, 2012, Prior to the Entry

On November 29, 2012, at approximately 1:00 p.m., law enforcement officers intercepted a conversation between Chaparro and Valencia during which they agreed to meet to discuss a narcotics transaction. Compl. II ¶ 87; Compl. I, Domico Aff. ¶ 7; TP12 #338; Hr'g Tr. 78. A few hours later, at 4:56 p.m., Valencia called Chaparro, who told Valencia to meet him in a parking lot at 2820 N. Cicero Ave. Chicago, Illinois. Compl. II ¶ 88. At 5:34 p.m., officers observed Chaparro and Valencia sitting in a vehicle together in a parking lot near that address. *Id.* ¶ 89.

The officers intercepted another call the next day, November 30, at 9:58 a.m. *Id.* ¶ 90. At that time, Chaparro and Valencia discussed a deal involving two kilograms of cocaine that would take place at 11:00 a.m. *Id.* At 10:38 a.m., officers observed Chaparro drive a gold Mazda from his residence to the Mendez residence. *Id.* During another intercepted phone call at 10:42 a.m., Chaparro informed Valencia that the exchange would occur in a manner that was the "same as last time he [Cuevas] came here." *Id.* ¶ 91. Valencia responded, "[o]kay, in about 20 minutes he is going over there." *Id.*

At approximately 11:33 a.m., Cuevas was driving westbound in a green Hyundai on Grace Street in Chicago, Illinois. *Id.* ¶ 93. At approximately 11:34 a.m., law enforcement conducted a traffic stop of Cuevas a few blocks away from the Mendez residence. *Id.* During the stop, a law enforcement officer observed two rectangular-shaped objects in a gift bag located on the vehicle's passenger seat that, based upon the officer's training and experience, he understood to be two kilograms of cocaine. *Id.* Immediately following the traffic stop, the law

enforcement officer assumed control of the green Hyundai and its contents. *Id.* ¶ 94. With another officer riding as a passenger, the law enforcement officer began driving the Hyundai around the area of the Mendez residence while determining whether to attempt a controlled delivery of the cocaine to defendants at the house. *Id.*

At 11:41 a.m., during an intercepted phone conversation between Chaparro and Mendez, Chaparro told Mendez to "[o]pen the door in the back," which officers understood to mean that Mendez was to open his garage door so that the car delivering the drugs could enter. *Id.* ¶ 95. Around the same time, the officer who was driving the green Hyundai saw Chaparro driving the gold Mazda behind him. *Id.* ¶ 96. Shortly thereafter, the officer turned southbound onto Olcott to head toward Mendez's residence. *Id.* As the officer turned onto Olcott, he witnessed Chaparro drive into the alley to the east of Olcott. *Id.* Chaparro stopped, honked the horn, waved his hand, and gestured that the officer should drive the Hyundai into the alley. *Id.* The officer believed that Chaparro was attempting to direct him toward Mendez's garage. *Id.* Rather than obeying Chaparro's signals, the officer drove southbound on Olcott, past the Mendez residence, and continued to drive around the area. *Id.*

At approximately 11:41 a.m., during another intercepted phone call, Chaparro asked Valencia why the green Hyundai was not entering the Mendez garage. Hr'g Tr. 96; TP12 #483. Chaparro stated, "[l]isten, you send someone who has never come here. He is going around in circles over here, and I am behind him blowing the horn, and he keeps going, and going, and going." *Id.* Valencia asked, "[b]ut it's [Cuevas], no?" *Id.* Chaparro responded, "[n]o, it's the other jerk, the brother, I think . . . but he has never come here. He is already in front of me. I am blowing the horn and he does not stop." *Id.* Then Valencia said, "[a]lright, give me a few." *Id.*

Minutes later, at 11:46 a.m., the officers intercepted another phone call between Chaparro and Valencia. Hr'g Tr. 97-99; TP12 #487. During this phone call, Valencia insisted that Cuevas was the driver, but Chaparro questioned whether this was the case because Cuevas had previously been to the Mendez residence, and the driver of the car had darker skin than Cuevas. *Id.* Valencia responded that, although Cuevas was not answering his calls, he "always goes two or three times around the block before he arrives there." *Id.*

At 12:05 p.m., Chaparro called Valencia to tell him that he saw two men in the green Hyundai. Hr'g Tr. 100-01; TP12 #489. When Valencia told Chaparro that Cuevas came alone, both men appeared to realize that Cuevas had been intercepted. *Id.* Valencia said, "[t]hey took him or something, they're f****d." *Id.* Hearing this, the surveillance team believed that the investigation was compromised because Chaparro knew that the delivery had been intercepted and would likely inform Mendez of this. Hr'g Tr. 101; *see* TP12 #482. At this point, Lt. Cline directed all law enforcement officers to be on the look-out for any suspects who might attempt to remove evidence from the house. Hr'g Tr. 101. The officers were also aware that, although they had tapped a number of cell phones used by Chaparro and Mendez, the two were continuously getting new phones and switching phones. As a result, the officers were not sure whether the wiretapped phones were the only phones that Chaparro and Mendez were using. Hr'g Tr. 9-10.

### 6. The Entry into the Mendez Residence and Mendez's Arrest

Minutes later, officers observed Rosado leave the Mendez residence carrying a baby in a car carrier and a bag. She then entered the Jeep parked in front of the house. Hr'g Tr. 102, 206. At the same time, officers observed Candelario Espinoza ("Espinoza"), one of Chaparro's cocaine suppliers, approach the Mendez residence in a vehicle. *Id.* 102. Officers Betancourt and

Wagner approached Espinoza and asked him to exit his vehicle. *Id.* 103. At the same time, Officer Harris approached the front door of the residence, and Lt. Cline approached Rosado. *Id.*

When Officer Harris knocked on the door of the Mendez residence and announced his presence, he saw Mendez look out through the front window. *Id.* 104. Officer Harris told Mendez that officers needed to talk to him, but Mendez responded to the effect of "[f]*** that" and ran away from the window. *Id.* 105. Officer Wagner approached the side door of the Mendez residence and observed Mendez attempting to flee out of the side door. *Id.* When Mendez encountered Officer Wagner, he ran back inside the house. *Id.* Mendez then attempted to escape the house through a window but was met by Officer Wagner and again retreated into the house. *Id.* at 105-06. Mendez was then observed in the attic of the house, after which the officers lost sight of him for a minute. *Id.* 106, 205.

Concerned that Mendez was destroying evidence, Lt. Cline asked Rosado for consent to enter the Mendez residence. *Id.* 107. Rosado handed the keys to the house to Lt. Cline. *Id.* Law enforcement entered the house and saw Mendez and another man named Garcia inside the house. *Id.* 107-08. With their guns drawn, Officer Harris and Lt. Cline ordered Mendez and Garcia onto the ground, and they complied. *Id.* 108. Mendez and Garcia were patted down and handcuffed for the officers' safety. *Id.* Lt. Cline ordered Officers Harris and Wagner to conduct a protective sweep of the residence to ensure that there were no other individuals in the house. *Id.* After entering the Mendez residence, Lt. Cline spoke with attorneys at the U.S. Attorney's Office regarding the status of the investigation. *Id.* 113.

At that point, Lt. Cline advised Mendez of his Miranda rights, and Mendez acknowledged that he understood his rights. *Id.* 109. Lt. Cline took Mendez into the basement, which also served as the master bedroom, so that Garcia could not overhear their conversation. *Id.* Garcia,

Espinoza, and Rosado were seated in the front living room of the residence. *Id.* 110. Lt. Cline was never alone with Mendez and was accompanied at various times by Officer Wagner, Officer Becina, other officers, and Rosado. *Id.* 111.

Lt. Cline informed Mendez that he was a target of a long-term investigation and that he wanted Mendez to cooperate with the investigation and provide any information regarding the homicide of Officer Lewis, who was believed to have been murdered by one of Mendez's associates in the Spanish Cobra street gang. *Id.* 110-11. At some point during the conversation, Lt. Cline uncuffed Mendez. *Id.* 111. Lt. Cline indicated that Mendez could provide a symbol of his cooperation by signing a form indicating his consent to search the residence. *Id.* 112. Mendez stated he was interested in cooperating, but he wanted to speak to Chaparro before he did so. *Id.*

### 7. Chaparro's Arrest at the Mendez Residence

At 1:05 p.m., Mendez spoke to Chaparro by telephone and told him that officers were at his house. Mendez also told Chaparro that the officers were waiting for a warrant and wanted Mendez and Chaparro to cooperate. TP12, #508. At 1:07 p.m., Mendez had another telephone conversation with Chaparro and told him that officers were on their way to get Chaparro and that Lt. Cline knew details about their operations that demonstrated that they had been watched for six months. TP 7, #5928. At 1:53 p.m., in another telephone conversation, Mendez told Chaparro that, according to the officers, the only way for Mendez to cooperate was for Mendez to sign a search consent form. TP12, #0000. In another call, at 1:57 p.m., Chaparro instructed Mendez, "[d]on't say anything, okay?" TP12, #534.

Shortly thereafter, law enforcement officers conducted a traffic stop of a vehicle driven by Chaparro. Hr'g Tr. 117. About half an hour after he was stopped, Chaparro arrived at the

Mendez residence. *Id.* Lt. Cline then informed Chaparro about the long-term investigation and that Chaparro and Mendez could be charged with drug offenses. *Id.* 117-18. According to Lt. Cline, although Mendez appeared to be "kind of pleading to his father to give him the approval to cooperate," Mendez never signed the consent form. *Id.* 119.

After three to four hours of questioning Mendez and an hour and a half of questioning Chaparro, Lt. Cline felt that a change of venue would impress the gravity of the situation upon Mendez. *Id.* 120, 137. Accordingly, Lt. Cline ordered the other officers to arrest and relocate Mendez and Chaparro to the Homan Square police station so that they could be interviewed there. *Id.* Neither Mendez nor Chaparro had asked for an attorney up to this point. *Id.*

Because Mendez would not agree to cooperate or sign the consent form, law enforcement officers began to consider applying for a search warrant. Lt. Cline acknowledged, however, that he was not aware of anyone preparing an affidavit for a search warrant at that time. *Id.* 120, 153. Lt. Cline informed Rosado, who had not been arrested at that time, that the law gave him the legal right to secure the premises to ensure that no evidence was destroyed while he obtained a search warrant. *Id.* He told her that officers had the option of securing a warrant to search the house. *Id.* 121. Rosado asked Lt. Cline if she could sign the consent form; Lt. Cline responded that she could. *Id.* 122. Within twenty minutes after Mendez and Chaparro were taken to Homan Square police station, Rosado voluntarily consented to a search of the house in the presence of Lt. Cline and Officers Harris, Zablocki, and DeLopez. *Id.* 122, 149. Had she not consented, Lt. Cline would have sought a search warrant. *Id.* 123. During the search, officers found, among other things, approximately 2722 grams of heroin, 61.6 grams of cocaine, $209,130.00, and a loaded firearm. *Id.* 262; Gov't Resp. Mot. Suppress 16. Chaparro and Mendez seek to suppress this evidence in the instant motion.

**Discussion**

I.    **The Motions to Suppress Evidence**

Defendants Mendez and Chaparro first move to suppress the evidence obtained during the search of the Mendez residence on November 30, 2012, as violative of the Fourth Amendment. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Exceptions include "a resident's consent[] or circumstances that justify action before a warrant can be obtained (e.g., ongoing or impending destruction of evidence)." *United States v. Cazares-Olivas*, 515 F.3d 726, 728 (7th Cir. 2008).

Furthermore, because the purpose of the exclusionary rule "is to deter future Fourth Amendment violations," "[w]here suppression fails to yield appreciable deterrence, exclusion is clearly . . . unwarranted." *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (quotation omitted). As explained by the Supreme Court in *Nix v. Williams*, "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, and not a worse, position than they would have been in had no police error or misconduct occurred." 467 U.S. 431, 443 (1984). Thus, "evidence is admissible when it would have been discovered inevitably through lawful means" because "permitting people to get away with crime is too high a price to

pay for errors that . . . do not play any causal role in the seizure." *Cazares-Olivas*, 515 F.3d at 728; *see Nix*, 467 U.S. at 443.

### A.      Mendez's Motion

Mendez contends that the government's warrantless entry and subsequent search of his home violated his rights under the Fourth Amendment.  In response, the government argues that the warrantless entry into Mendez's residence was proper because (1) Jamie Rosado consented to the entry; (2) exigent circumstances were present that necessitated the entry; and (3) the seized evidence is admissible because it would have been discovered inevitably through lawful means. The Court addresses each argument in turn.

### 1.      Rosado's Consent to Enter the Mendez Residence

First, the government argues that Jamie Rosado, an individual who lived with Mendez and was a co-owner of the residence, gave sufficient consent to enter the Mendez residence.  The Court disagrees.

"Where someone with the authority to do so gives consent to enter, . . . the entry is reasonable and not in violation of the Fourth Amendment." *Harney v. City of Chi.*, 702 F.3d 916 (7th Cir. 2012).  Thus, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974).  However, such authorization is insufficient if another co-tenant is present and objects to the search. *Georgia v. Randolph*, 547 U.S. 103, 119 (2006).

Here, it is true that Rosado provided Lt. Cline with keys to the house at his request, thereby consenting to the entry of the Mendez residence.[3]  However, as Lt. Cline approached Rosado in the driveway, Mendez, who then was inside the house, was telling Officer Harris to "[f]*** that" when Harris asked to enter the house.  Because Mendez's blunt words and accompanying actions clearly communicated his objection to entry, Rosado's consent was invalid as to Mendez and did not provide the government with the right to enter.  *See id.* at 115 ("[T]he cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place.").

## 2.    Exigent Circumstances

Next, the government argues that exigent circumstances justified the warrantless entry into the Mendez residence.  As noted above, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403.  "One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment."  *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quotations omitted).  "[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search."  *Id.* (quotation omitted).

Although the exception does not apply when the exigency is "created or manufactured by the conduct of the police," because people who possess drugs are "unlikely to destroy them unless they fear discovery by the police[,] . . . a rule that precludes the police from making a

---

[3] Rosado's initial consent to enter the house is not to be confused with her subsequent signing of the consent-to-search form that preceded the officers' search of the Mendez residence.  *See United States v. Montoya*, No. 06-CR-12, 2006 WL 1277940, at *1 (E.D. Wis. May 5, 2006).

warrantless entry to prevent the destruction of evidence whenever their conduct causes the exigency would unreasonably shrink the reach of this well-established exception to the warrant requirement." *Id.* at 1856-57. Thus, the Supreme Court has held that "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable." *Id.* at 1858. An example of unreasonable conduct is "where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted." *Id.* at 1858 n.4.

"[T]he burden is on the government to show that the warrantless entry is justified by exigent circumstances, and 'an objective standard governs the reasonableness of law enforcement officials' belief that exigent circumstances have arisen.'" *United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir. 1987) (quoting *United States v. Dowell*, 724 F.2d 599, 602 (7th Cir. 1984)). "In determining whether the agents reasonably feared imminent destruction of the evidence, the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *United States v. Talkington*, 843 F.2d 1041, 1044 (7th Cir. 1988).

The Court holds that the government has met its burden of establishing that, at the time the officers entered the Mendez residence, they reasonably feared the imminent destruction of narcotics. Furthermore, there is no evidence that the police officers' conduct preceding the exigency was unreasonable or that they had engaged in or threatened to engage in conduct that violates the Fourth Amendment.

For his part, Mendez argues that it was unreasonable for the officers to believe that narcotics were stored in the Mendez residence, rather than in the detached garage. There is ample evidence in the record, however, indicating that Mendez and Chaparro had stored substantial

amounts of cocaine and heroin in the Mendez residence on a continual basis up to and including November 30, 2012. For example, on September 3, 2012, Chaparro was seen carrying brick-shaped objects in a plastic grocery bag into the Mendez residence shortly after he had purchased ten kilograms of cocaine from Arguijo. On September 19, at Mendez's request, Rosado packaged 225 grams of heroin and gave it to a customer, Melendez, while both were inside the Mendez residence. On November 9 and 23, 2012, officers observed Chaparro with a known drug supplier and a broker, respectively, pull into the garage at the Mendez residence for several minutes and then leave. Based on their observations, officers reasonably believed that shipments of narcotics were unloaded in Mendez's garage and that substantial amounts were brought into the Mendez residence for safekeeping and/or sale.[4] Furthermore, on November 24, 2012, Chaparro told Mendez he was on his way to the Mendez residence a minute after Chaparro agreed to sell a large quantity of cocaine to Wilson. Then, on November 26, officers intercepted the delivery of several kilos of cocaine to the house. All of these facts support the law enforcement officers' reasonable belief that narcotics were being kept at Mendez's house.

Second, based upon intercepted calls, law enforcement officers were aware, that approximately ten minutes prior to their entry into the Mendez residence, Chaparro had discovered that the driver of the green Hyundai on November 30, 2012, was not the courier who had been sent to deliver the narcotics. At that point, Chaparro suspected that the intended courier had been intercepted. Moreover, Lt. Cline and the other law enforcement officers knew that Mendez and Chaparro commonly used multiple phones at any one time and were continuously buying new phones and hence were not sure whether Chaparro and Mendez had access to phones

---

[4] This belief is bolstered by the fact that when a delivery was made to the garage, Chaparro called Mendez to make sure he was home. Furthermore, it was reasonable for the officers to believe, given the circumstances, that Chaparro and Mendez were dealing in large quantities of drugs and would store such large quantities in Mendez's house, rather than in an unguarded, detached garage that, although locked, was accessible by a public alleyway.

other than those being monitored. Thus an officer on the scene could reasonably believe that, minutes prior to their entry into the house, Chaparro could have used an unidentified cell phone to tip off Mendez that law enforcement officers had intercepted the courier and knew that two kilos of cocaine were being delivered to Mendez that day.

Third, before entering the house, the officers saw Mendez running rapidly around the house. When Mendez realized that he could not flee the house, the officers saw him run up to the attic, and they lost sight of him for a minute. Based upon these observations, it was reasonable for the officers to conclude that Mendez, realizing that he could not escape, ran up to the attic in an effort to destroy narcotics stored there.

Furthermore, the Court concludes that the law enforcement officers' conduct preceding the exigency was not unreasonable. The officers' interception of the drug courier on the way to the Mendez residence was not an unreasonable course of action given the circumstances of their drug investigation. Nor was the conduct of the officers prior to entry unreasonable. Officer Harris merely knocked on the door of the Mendez residence, announced his presence, told Mendez that the officers needed to talk to him, and asked him to answer questions. Finally, based upon their observations of Mendez running throughout the house and their knowledge garnered from the investigation as a whole, it cannot be said that the officers lacked a legally sound basis for the warrantless entry. Accordingly, the Court concludes that, based upon the totality of the circumstances, the officers' conduct preceding the entry was reasonable, they did not threaten to engage in conduct that violates the Fourth Amendment, and they had a sound basis for the warrantless entry.

For all of these reasons, the Court holds that the officers' reasonable fear of the imminent destruction of narcotics and related equipment justified the officers' decision to enter the

residence without a warrant. Accordingly, the Court denies Mendez's motion to suppress on this basis.

### 3.    The Subsequent Search and the Inevitable Discovery Doctrine

That the officer's initial entry into the Mendez residence did not violate the Fourth Amendment does not automatically render the subsequent search of the house after the arrest and removal of Mendez and Chaparro proper. Rather, once the officers entered the house and secured it, any subsequent search of the house must also meet constitutional muster. *See Quint v. Vill. of Deerfield*, 365 F. App'x 697, 701 (7th Cir. 2010) (stating that where "[w]arrantless entries are permitted to prevent the imminent destruction of evidence . . . even then the police may do no more than conduct a protective sweep and then secure the premise until a search warrant can be obtained."); *see also United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992) (declining to hold that "the presence of exigent circumstances obviates the need for a warrant in any subsequent search, no matter how long delayed."). Here, the government contends that, after Mendez and Chaparro were arrested and removed, Rosado provided them with written consent to search the premises. Although the parties hotly contest the validity of the consent, the Court need not decide this issue because Mendez's motion fails under the inevitable discovery doctrine. *See Alexander*, 573 F.3d at 477 (stating that where a court holds that the inevitable discovery doctrine applies, the issue whether consent is voluntary and therefore sufficient to authorize the search is irrelevant).

"Under the inevitable discovery doctrine, the exclusionary rule is inapplicable where the government establishes by a preponderance of the evidence 'that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Alexander*, 573 F.3d 465, 477 (7th Cir. 2009) (quoting *Nix*, 467 U.S. at 444). The doctrine is based on the

understanding that "a person can't complain about a violation of his rights if the same injury would have occurred even if they had not been violated." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (quotation omitted). "[I]f [the government wants to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant, . . . [it must] prove that a warrant would certainly, and not merely probably, have been issued had it been applied for." *Id.* "To satisfy this burden, the government must show (1) that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; and (2) that it would have conducted a lawful search absent the challenged conduct." *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012) (quotations omitted).

With regard to the first requirement, given the totality of the circumstances, the government has shown that, as a result of its extensive investigations, it already had obtained an independent, legal justification for conducting a search of the Mendez residence. The investigation by the CPD, the DEA, and the U.S. Attorney's Office into Mendez and Chaparro's drug trafficking activities occurred over the course of several months in 2012, leading up to the events of November 30. The investigation involved at least nine separate wiretap orders, as well as surveillance units at Chaparro and Mendez's residences, and roving surveillance units that tracked their customers, suppliers, and Chaparro and Mendez themselves. Through intercepted conversations, officers overheard multiple conversations during which Chaparro arranged the purchase and sale of narcotics, and Chaparro and Mendez arranged for the delivery of the narcotics to Mendez's house. In one such conversation, officers overheard Mendez tell Rosado to package and distribute heroin at the house, shortly after which officers saw Melendez arrive, enter the house, and leave minutes later holding a bag. On another occasion, officers saw

Chaparro carrying brick-sized packages into the Mendez residence after he had obtained ten kilograms of cocaine. Days before the search of the Mendez residence, officers also observed on two separate occasions a known narcotics supplier and a courier pull into Mendez's garage, close the door, and leave several minutes after arriving. Based upon these observations, the officers reasonably believed that narcotics were being delivered to the Mendez property on a regular basis and that some, if not all, of the drugs were being stored in the house. Thus, the Court holds that a warrant to search the Mendez residence would have been issued had the government applied for it, and the resulting search would have led to the discovery of the heroin, cocaine, cash, and the loaded firearm.

In addition, the government has satisfied the second requirement of the inevitable discovery doctrine because it has demonstrated that it would have taken steps to obtain a warrant. "Our case law establishes that the inevitable discovery rule applies . . . where investigating officers undoubtedly would have followed routine, established steps resulting in the issuance of a warrant." *United States v. Marrocco*, 578 F.3d 627, 639 (7th Cir. 2009). The government "is not required to show that investigators in fact obtained or sought a warrant in order to prove that they inevitably would have done so." *Id.* at 640 n.21. Instead, the government need only demonstrate that "[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant." *Id.* at 640.

The Court agrees with the government that it would be unreasonable to conclude that, after such an painstaking investigation into the drug trafficking activities of Mendez, Chaparro, and their associates and the facts uncovered as a result, the DEA and the CPD would have failed to seek a warrant to search the Mendez residence, had Rosado not consented to the search. In fact, not only did the officers possess the information discussed above, but they were in frequent

communication with the U.S. Attorney's Office regarding the status of the ongoing investigation and operations. For instance, when law enforcement officers intercepted Cuevas in the green Hyundai on the day the Mendez residence was searched, Lt. Cline and Officer Harris were on the phone with the U.S. Attorney regarding whether they should attempt a controlled buy in the green Hyundai. In addition, Lt. Cline communicated with the U.S. Attorney's Office after the officers entered the Mendez residence. This continuous contact with the U.S. Attorney supports the conclusion that the officers would have followed routine, established steps resulting in the seeking and issuance of a warrant. The Court thus concludes that, even if the officers' entry in to the house had violated the Fourth Amendment and/or Rosado's subsequent consent was invalid, the articles discovered at the Mendez residence would still be admissible under the inevitable discovery doctrine.

**B.      Chaparro's Motion**

As for Chaparro, the government argues that Chaparro lacks standing to challenge the entry to and search of the Mendez residence on Fourth Amendment grounds. "The Supreme Court has consistently held that 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (quoting *Rakas v. Ill.*, 439 U.S. 128, 134 (1978)). Even when a person is affected by an allegedly illegal search or seizure, he does not have standing to challenge the search unless the act was an infringement of his own Fourth Amendment rights. *United States v. Payner*, 447 U.S. 727, 731-32 (1980). Thus, a person's "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

Chaparro argues that he had a reasonable expectation of privacy in the Mendez residence because, although his name is not on the property title, he supplied the money for Mendez and Rosado to buy the house, he had unlimited access and permission to enter and stay at the residence at all times, and he had permission to store property at the residence. (Chaparro Aff. ¶¶ 1-4.) But, while Chaparro had a key and access to the house's alarm code, Chaparro did not live or sleep at the Mendez residence and did not visit daily.

Because his presence at the Mendez residence was sporadic and for short periods of time, Chaparro has failed to show that he had any prerogative to exclude others from those particular areas of the house in which he stored his property. Nor has Chaparro shown that he had a subjective expectation of privacy in the areas of the Mendez residence where the evidence was found. Accordingly, there is insufficient evidence that he had a reasonable expectation of privacy in the property. *See Carter*, 525 U.S. at 90 ("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."); *Terry v. Martin*, 120 F.3d 661, 663 (7th Cir. 1997) (stating that courts have rejected the notion that temporary day visitors have a reasonable expectation of privacy). Because the Court has determined that Chaparro lacks standing to challenge the entry to and search of the Mendez residence, the Court denies his motion to suppress on that basis.[5]

II.     **Mendez's Motion to Suppress Statements**

Lastly, Mendez moves to suppress his statements to law enforcement officers on November 30, 2012, arguing that they failed to administer a *Miranda* warning and therefore his statements were obtained in violation of his Fifth Amendment privilege against self-incrimination. *See* Mendez's Reply Br. 1. Mendez had submitted an affidavit before the

---

[5] The Court notes that, even assuming, *arguendo*, that Chaparro did have standing to press his motion, the Court would still deny the motion to suppress evidence for the same reasons it denies Mendez's motion.

evidentiary hearing, but then at the hearing, he declined to testify. This left uncontradicted Lt. Cline's testimony that he had advised Mendez of his Miranda rights after the officers had entered the house and that Mendez acknowledged that he understood those rights. Hr'g Tr. 109. Lt. Cline also allowed Mendez to call an attorney but he did not request one. *Id.* 120, 181.

In sum, based on Lt. Cline's testimony, which this Court finds credible, the Court finds that Mendez was provided with his Miranda warnings and that he waived his rights to remain silent and to have a lawyer present during the interview. The Court therefore denies Mendez's motion to suppress his statements.

## Conclusion

For the aforementioned reasons, the Court denies Johnny Chaparro and Johnny Mendez's motions to suppress evidence recovered from the residence located at 3717 N. Olcott Avenue, Chicago, Illinois, and Johnny Mendez's motion to suppress statements he made to authorities on November 30, 2012 [doc. nos. 164, 165, 166].

**SO ORDERED**                    **ENTER:  8/5/14**

_____
**JOHN Z. LEE**
**U.S. District Judge**